UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SEMICONDUCTOR COMPONENTS INDUSTRIES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> LA SEMICONDUCTOR LLC, *et. al.,* <br><br> Defendants. | ) CASE NO. 5:24-cv-2215 <br> ) <br> ) CHIEF JUDGE SARA LIOI <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**TEMPORARY ORDER APPOINTING RECEIVER WITH LIMITED POWERS**

This matter came on for consideration of the *Plaintiff's Emergency Motion for Appointment of a Receiver* (Doc. No. 3) (the "Receiver Motion"), and *Plaintiff's Motion for an Ex-Parte Hearing on Its Motion for Emergency Appointment of a Receiver* (Doc. No. 4) (the "Ex-Parte Motion" and collectively with the Receiver Motion, the "Motions"), pursuant to Rules 65 and 66 of the Federal Rules of Civil Procedure, filed by Plaintiff Semiconductor Components Industries, LLC ("Plaintiff") for the *ex parte* appointment of a receiver over all assets and to oversee and manage the current and future assets, properties, undertaking, and all proceeds thereof of Defendant LA Semiconductor LLC ("LAS" or the "Company") to the extent associated with maintaining and operating the Pocatello, Idaho located wafer manufacturing facility (the "Fab") and related equipment (the "Equipment"). Upon review of the Motions, the first declaration of Peter Buckles, Director of Mergers and Acquisitions and Securities of Plaintiff (the "First Buckles Declaration"), and Dr. Brian Kushner of FTI Consulting, Inc. (the "Kushner Declaration") in support thereof, and the record in this case, telephonic hearings were held on the afternoons of December 19 and 20, 2024. Subsequent to those hearings, and at the Court's request, Plaintiff

provided a supplemental declaration of Mr. Buckles (the "Second Buckles Declaration"). Based on those materials and representations from counsel, the Court finds as follows:

  A. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are of complete diverse citizenship and the amount in controversy is in excess of $75,000. Venue is appropriate in this District because Defendant LAS and Defendant Ward each are domiciled in the Northern District of Ohio.

  B. On December 19, 2024, Plaintiff initiated this case by filing its *Verified Complaint for Temporary Restraining Order, Preliminary and Permanent Injunction, Declaratory Judgment and Other Relief* (Doc. No. 1) (the "Complaint"), seeking, among other things, redress for the breaches of the Agreements[1], misrepresentations, and fraud of Defendants relating to Plaintiff's sale of the Fab to LAS, which Transaction closed on or about October 14, 2022. As explained in the Complaint and Declarations, a material condition to the closing of the Transaction was LAS's commitment that it would continue to operate the Fab and would supply Products to Plaintiff for use by Plaintiff and Plaintiff's customers for a period of not less than five years.

  C. Since the closing of the Transaction, however, LAS has been and continues to be (i) insolvent or otherwise financially unstable, and (ii) unable or unwilling to pay its operating expenses, most of which have been voluntarily funded by Plaintiff in an effort to ensure LAS could continue to operate and supply Products to Plaintiff to avoid irreparable harm to Plaintiff and its customers.

  D. LAS's operation and control of its business jeopardizes the continued production of and supply of certain critical component products by LAS to Plaintiff, which threatens to cause irreparable harm to Plaintiff and its customers, which include the United States Department of

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the verified Complaint or the Receiver Motion, as the case may be.

Defense and private entities in the aerospace, defense, and other industries critical to U.S. national security.

E.	According to the reports provided by Plaintiff, Defendants appear to have engaged in fraud by, among other things, falsifying the Company's books and records to mask its dire financial condition. Defendants are also suspected of breaching the Agreements by diverting funds and/or other assets of LAS to Defendant Ward or other entities owned by him, and selling Products to other LAS customers that were manufactured using inputs paid for by Plaintiff for the sole purpose of supplying Products to Plaintiff.

F.	Plaintiff therefore filed the Motions seeking *ex parte* temporary and limited appointment of FTI Consulting Inc. ("FTI"), through its team led by Senior Managing Director Dr. Brian G. Kushner ("Dr. Kushner"), Ms. Nicole Horton ("Ms. Horton"), and Mr. Carl Jenkins ("Mr. Jenkins"), as receiver over the Company and the Assets (as defined below). The receivership is sought to stabilize the operations of the Company, prevent the ongoing fraud allegedly perpetrated by the Defendants, and ensure that the Products are available and provided to Plaintiff and its customers in accordance with the Agreements until the Hearing Date.

G.	FTI is experienced in the areas of distressed property and business management, and has worked specifically with LAS. The Court finds that FTI is qualified to serve as the Receiver in this limited capacity. Further, FTI has significant receivership experience and has agreed to accept fees for its services and the services of its employees and operational consultants as set forth in the Kushner Declaration attached to the Receiver Motion as Exhibit C.

H.	The purpose of this Temporary Order is to maintain uninterrupted operation of the Fab and its business operations until the Hearing Date and pending further order of this Court.

I.     Federal Rule of Civil Procedure 65 places limits on when a Court may issue a TRO "without written or oral notice to the adverse party or its attorney[.]" Fed. R. Civ. P. 65.  A court may do so "only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). *Ex parte* restraining orders should be limited to preserving the status quo for only so long as is necessary to hold a hearing. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, etc.*, 415 U.S. 423, 439, 94 S. Ct. 1113, 1124, 39 L. Ed. 2d 435 (1974).

J.     Federal Rule of Civil Procedure 66 governs the appointment of a receiver.  Generally speaking, the appointment of a receiver is not made *ex parte*. *See Tennessee Pub. Co. v. Carpenter*, 100 F.2d 728, 731 (6th Cir. 1938). "The remedy in such circumstances is not to be granted loosely, but is to be watched with jealous eyes." *Id.* at 731–32 (citing *Shapiro v. Wilgus*, 287 U.S. 348, 356, 53 S. Ct. 142, 145, 77 L. Ed. 355 (1932).  "The appointment of a receiver without notice is entirely a matter of judicial discretion." *Id.* at 732. Federal courts typically consider the following factors when determining whether to appoint a receiver: "(1) whether more modest measures would adequately protect the movant; (2) whether legal remedies appear to be inadequate; (3) whether there is ongoing fraud or imminent danger of the property being lost, injured, diminished in value, or squandered; and (4) whether there had been a showing that the harm accruing to the movant by denial clearly overbalanced the harm to the nonmovant upon granting the appointment." *FTE Networks, Inc. v. Szkaradek*, No. 22-785, 2024 WL 4024696,

4

at *3 (D. Del. Sept. 3, 2024) (quoting *KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, 781 F. App'x 119, 122 (3d Cir. 2019)) (internal quotation marks omitted).

K. In no particular order, the Court finds the following facts combined to satisfy these factors.

    i. First, the materials submitted in support of the Motions include a report prepared by Joe Graff, an accountant specifically retained by the Company to review its liquidity and financial issues. The Graf Report indicated a high likelihood that Defendants have been misrepresenting the financials of the Company and engaging in fraud in order to conceal misappropriation of funds. (Doc. No. 1 ¶¶ 46–51.) The findings were based, in part, on information from Bill Demboski, the Company's outside accountant, who concluded that the Company's financial data included "a lot of fictitious data." (*Id.*; Doc. No. 1-7, at 2–3.)

    ii. Second, for two years Plaintiff has propped up Defendants' business in every respect, including, through the present, "paying for essentially all of [the Company]'s costs and expenses associated with operating the Fab, including but not limited to payroll, taxes, insurance, raw materials, and equipment lease expenses." (Doc. No. 1 ¶ 4; Doc. No. 3-2, ¶¶ 12–14.) The Company "was unable to take over operational control of the Fab because it, among other things, did not have sufficient financial resources, including working capital, and failed to obtain the necessary licenses, employ the necessary staff, or properly plan for the Fab's safe operation." (Doc. No. 3-2 ¶ 12.) Without Plaintiff's support, "the Fab simply could not operate." (Doc. No. 1 ¶ 4.) Even at the time of closing, the Company failed to hold $30 million in Sufficient Funds consistent with the APA. (*Id.* ¶¶ 23–26.)

        Additionally, the Company could not secure necessary financing to pay for the Fab's $11 million in work-in-progress inventory. (*Id.* ¶¶ 27–28; Doc. No. 3-2 ¶ 20.)

iii. Third, Defendants have already committed what appear to be bad faith breaches of its Agreements with Plaintiff, including making "blatant misrepresentations to third parties," disseminating Plaintiff's confidential information, and misusing consigned funds. (Doc. No. 1 ¶¶ 1, 65–70.)

iv. Fourth, Defendant Ward has threatened to divert the Company's assets, in direct breach of contract with Plaintiff, despite Defendant Ward having contributed nothing to the financial wellbeing of the Company during his two-year ownership of the Fab. Indeed, Plaintiff has "recently learned" that Defendant Ward may be making good on his threat and already "diverting Products and associated profits to an affiliated entity, causing further financial distress for [the Company] and potentially rendering [the Company] insolvent." (Doc. No. 3, at 1.)

v. Fifth, Defendants breached the Company's equipment lease agreement with third-party Macquarie Equipment Capital Inc. ("MECI"), by, among other things, failing to pay rent and refusing to permit MECI to inspect the equipment. When MECI filed suit, Defendants defaulted. MECI is currently seeking nearly $175 million—not including approximately $115,000 of attorneys' fees, and interest. (Doc. No. 1 ¶¶ 87–102.) As of the date of the Complaint, Plaintiff has already spent over $11 million for the use of the necessary equipment as a stopgap measure to maintain manufacturing operations at the Fab. (*Id.*)

vi. Sixth, Defendant Ward made clear to Plaintiff "that he would rather: (i) fire all the employees than sell [the Company]'s business operations back to [Plaintiff] and (ii)

turn the power off rather than allow MECI to seize the Equipment." (Doc. No. 6 ¶ 2.) The Court agrees that "[i]f this type of action occurred, it would take months to restart the Fab, would result in tens of millions of dollars in scrapped Products, and would set in motion an irreversible chain of events destroying any value associated with the Fab and [the Company]'s ability to continue manufacturing Products." (Doc. No. 3, at 2.) That threat is magnified by the fact that Plaintiff's clients "include the United States Department of Defense and private entities in the aerospace, defense, and other industries critical to U.S. national security." (*Id.* at 7.)

L. Taken together, the Court concludes that these factors combine to create an emergency scenario in which providing notice to Defendants would prompt them to irreparably and substantially harm the Company. Further, the Court is convinced that no less drastic remedy would be sufficient to protect Plaintiff's immediate interests against Defendants, who have made plain to Plaintiffs their willingness and intention to ruin the business rather than cede control.

M. The Court is well-aware of the extraordinary remedy it is granting in this instance, and that an *ex parte* "receivership must be justified by the existence of actual emergency." *Tennessee Pub. Co.*, 100 F.2d at 732. The Court has thoroughly considered the materials and representations of counsel and finds that this situation constitutes one of the very rare instances in which such temporary and limited action is necessary to maintain the status quo of the Company's business operations until the Hearing Date. *Id.*

N. Based on the materials and representations provided by counsel, the Court finds that appointment of a temporary receiver in this action is necessary and appropriate in a limited

capacity as set forth herein. Plaintiff has demonstrated an imminent danger that property will be concealed, lost, or its value diminished, and that legal remedies appear to be inadequate.

O.     This Court further finds that issuing this Order without notice pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure is appropriate because Plaintiff has presented specific facts clearly demonstrating that immediate and irreparable injury, loss, or damage will result to Plaintiff before the Defendants can be heard in opposition. Specifically, in the absence of an *ex parte* Order, Defendants could and likely would cause irreparable injury to Plaintiff and its customers.

P.     The balance of the equities in this case dictate appointment of the Receiver to take over temporary control of the business operations of LAS and take temporary control of the Assets.

Q.     The Court is satisfied that the relief requested in the Motions is proper and necessary on a temporary and limited basis in order to protect, preserve, and maintain the value of the Assets.

R.     The Motion specifically requests that the Court appoint FTI to act as receiver in this case. Since October 2023, FTI has provided advisory and consulting services to Plaintiff in relation to LAS, including, but not limited to, cash forecasting, liquidity management, and development of budgets. Accordingly, FTI is already familiar with LAS's business, its main contracts including the Wafer Supply Agreement, and the financial and other issues associated therewith. Based on this, the Court finds that the selection of FTI to serve as receiver, by and through Dr. Kushner, Ms. Horton, and Mr. Jenkins, is in the best interests of all interested parties and the receivership estate. Further, the Court finds FTI to be well qualified and that it meets all applicable requirements to serve as receiver over the Company and its Assets.

Accordingly, the Motion is **GRANTED** on a temporary and limited basis, and it is hereby **ORDERED** and **ADJUDGED** as follows:

1. FTI, through Dr. Kushner, Ms. Horton, and Mr. Jenkins, is hereby appointed receiver (the "Receiver") of, for, and over the Company and all its Assets, business, and affairs in the limited capacity as set forth herein until the Court can conduct a hearing on **January 3, 2025 at 1:00 p.m. E.T**. (the "Hearing Date") at the John F. Seiberling Federal Building and U.S. Courthouse, Two South Main Street, Courtroom 530, Akron, Ohio 44308-1811.

2. FTI is qualified to serve as receiver in this matter on a temporary and limited basis and it has the requisite experience and qualifications to serve as receiver of the Company pursuant to the terms of this Temporary Order. On a temporary and limited basis, the Receiver shall manage, preserve, and protect the Company, its income and profits, its Assets and property, and its rights and privileges. The Receiver shall also operate the Company's business in the ordinary course of business to maintain the status quo through the Hearing Date. While the Receiver shall take possession and control of the Company's Assets, the Receiver shall not take title to any Assets of the Company.

3. The Receiver is hereby granted, authorized, and vested with certain and specific powers, rights, and duties provided under the United States Code, the Federal Rules of Civil Procedure, the Local Rules, and other applicable laws and shall possess all powers, authorities, rights, and privileges to operate the Company's business in the ordinary course and to maintain the status quo. Without limiting the generality of the foregoing, the following provisions, and the powers and authority conveyed therein, apply to the Receiver and this receivership:

   a. **Custody and Control.** The Receiver shall take exclusive custody and control of the Company, including possession of the "Assets," which is defined for purposes of this Order to include: all the funds, property, mail, and other assets of, in the possession of, or under the control of the Company including, but not limited to all

real property, inventory, intellectual property, licenses, personal property, equipment, accounts, accounts receivable, Revenues (as defined below), general intangibles, investment property, instruments, documents, bank accounts and amounts therein, and any other property of any nature whatsoever of the Company. The Receiver may take all steps necessary to secure the business premises and the other Assets of the Company.

b. **Protect and Preserve Operations and Assets.** The Receiver may: (i) operate the Company and take all other actions it deems necessary to preserve, protect, and manage the Company, its business, and all Assets in order to preserve their value; (ii) pay all utility expenses or other obligations to suppliers or servicers in the ordinary course of business, including obligations incurred prior to commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that will accomplish the goals of the receivership; and (iii) make repairs necessary to maintain and protect the Assets.

c. **Collection of Revenues.** The Receiver will collect the profits, rents, revenues, cash flow, insurance proceeds, and all other income of any nature whatsoever from the Assets and operation of the Company (collectively, the "Revenues"), and shall pay from the Revenues all Receivership Expenses (as defined below). The Receiver has the authority to receive and endorse, present for payment, and/or collect any check, money order, credit card account, or other form of payment payable to either the Company or the Receiver.

d. **Receivership Expenses.** The Receiver may incur and pay out of the Revenues such expenses and obligations coming due after the date of the Receiver's appointment as may be necessary or appropriate for the maintenance, protection, or preservation, or operation of the Company's business, the Assets, or that are incurred in carrying out the directions set forth in this Order or other orders of this Court (collectively, the "Receivership Expenses"). The Receivership Expenses include, without limitation, all taxes and assessments, insurance premiums for property, casualty, liability and other essential insurance, utility expenses, operating expenses, lease obligations, wages, management fees, and compensation to the Receiver and any professionals retained by the Receiver, including attorneys' fees. To the extent the Revenues cannot satisfy the expenses and obligations coming due after the date of the Receiver's appointment, Plaintiff has agreed to, and shall, fund the payment of the Receivership Expenses without the need for further court order and Plaintiff shall be entitled to reimbursement for such Receivership Expenses in priority to other claims, except as otherwise provided by law.

e. **Bank Accounts.** The Receiver shall take immediate possession, control, management, and charge of all deposit, checking, savings, banking, and money management accounts belonging to the Company; change the name on any such existing account into the Receiver's name; relocate, at the Receiver's discretion, any such existing account to a new financial institution; and open and maintain deposit accounts in the Receiver's name. All institutions, banks, saving and loans,

    depositories, credit unions, brokerage accounts, and other financial institutions where any such accounts are located are directed to deliver such deposits and such records (including any information required by a bank or financial institution or financial or depository institution to enable the Receiver to take exclusive control over any and all accounts, such as access to online banking) as the Receiver may reasonably request with respect to such deposits and accounts to the Receiver.

    f. **Employment of Professionals.** Upon notice and Court approval, the Receiver may choose and employ professionals (the "Receiver Professionals") as the Receiver deems advisable or necessary in the performance of the Receiver's duties and responsibilities under the authority granted by this Order, and on the terms and conditions as the Receiver determines to be in the best interests of the receivership estate. If the estate does not have sufficient funds to cover the expenses, and Plaintiff fails to fund such expenses, the Receiver may seek orders from the Court to impose a charge on the assets to cover outstanding amounts.

    g. **Books.** The Receiver shall prepare and maintain complete books, records, and financial reports of the income and expenses associated with this case, and all other appropriate records.

    h. **Mail.** The Receiver shall have the right to issue demands in the name of the receivership upon U.S. Postal Service, or any other public or private entity, to gain exclusive possession and control of such postal boxes as are or may have been used by the Company for the receipt of rent, income, and other mail or packages related to the Company. The Receiver is authorized to open all mail (including all email), open packages, and receive all faxes and other communications addressed to or from the Company.

    i. **Other Actions.** The Receiver may do all such other things that are, in the Receiver's judgment, necessary for the protection, possession, control, management, operation, (but only pursuant to the terms, and subject to the limitations, of this Order) of the Company, its business, and/or the Assets.

4.     The Receiver shall immediately notify each of the Defendants of its appointment.

5.     The Receiver shall take reasonable actions to comply with all laws known by the Receiver to be applicable to the operation of the Company and its Assets including laws of the United States, the State of Ohio, the State of Idaho, and otherwise.

6.     Any person, including but not limited to the Defendants, provided notice of this Order must immediately, or within such time-period set forth by the Receiver in writing, cooperate

with the Receiver in the transition of the management of the Company, its business operations, and all other Assets, and shall turnover, deliver, or otherwise make available to the Receiver:

    a. Possession and custody of the Assets;

    b. Possession and custody of documents of the Company, including but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), vendor lists, customer lists, title documents, and other papers, wherever located, as the Receiver deems necessary for the proper administration, management, or control of the Company;

    c. All keys, computer passwords, entry codes, PIN numbers, and combinations to locks necessary to gain or to secure access to any of the Assets or documents of the Company, including but not limited to, access to the Company's business premises, means of communication, accounts, computer systems, and other property;

    d. Information identifying the accounts, employees, properties or other assets or obligations of the Company;

    e. All pending contracts involving the Company;

    f. All insurance policies of the Company;

    g. All documents pertaining to safety and environmental laws, together with all reports, surveys, inspections, orders, citations, warnings, and notices regarding the same;

    h. Site plans, surveys, specifications, floor plans, drawings, and measurements related to any Assets;

    i. All technical manuals related to any Assets; and

    j. Such other records related to any Assets as may be reasonably requested by the Receiver.

7. The Defendants shall turn over all Assets of the Company or the Fab to the Receiver. The Defendants and their members, managers, officers, employees, independent contractors, agents and representatives shall fully cooperate with Receiver and shall take all steps necessary to comply with this Order and other orders of the Court, and with all applicable law

and/or rules and are enjoined from interfering with the use, management, possession, control, and liquidation of the Assets by the Receiver.

8. The Defendants and their members, managers, directors, officers, agents and employees are prohibited from removing any Assets and diverting any income of the Company, the Fab, or the other Assets while this Temporary Order remains in effect.

9. The Defendants shall fully cooperate with the Receiver relating to the operation and management of the Company and its Assets, and the Fab. The Defendants and their members, managers, directors, officers, independent contractors, employees and agents are prohibited from canceling, modifying, reducing, or otherwise changing any and all insurance coverage in existence with respect to the Company or the Assets.

10. Except upon and to the extent of leave granted by this Court, or upon and in accordance with the express instructions of the Receiver, the Company, and its owners, members, managers, directors, officers, employees and agents, and any and all persons acting or purporting to act on behalf of the Company, including, without limitation, Defendant Ward, are enjoined and prohibited from taking, attempting to take, retaining possession of, and/or otherwise exercising control over, the Company, its business and any Assets, and are prohibited from diverting from the Company any Assets or any income related thereto.

11. Within 10 days of the entry of this Temporary Order, the Receiver shall file a report of the receivership's receipts and expenditures and acts and transactions by the Receiver.

12. The Receiver and the Receiver Professionals shall owe duties only to the receivership and the Court. The Receiver's retention of the law firm of Tucker Ellis, LLP as its attorneys is hereby approved.

13. The Receiver and the Receiver Professionals are entitled to reasonable compensation for the performance of services relating to this receivership, and for the cost of actual and reasonable out-of-pocket expenses incurred by them relating to such services. Fees of the Receiver and Receiver Professionals will be paid ahead of all other administrative expenses out of the assets of the receivership estate, notwithstanding any lien rights of creditors. The Receiver will be compensated in accordance with the rates attached to the Kushner Declaration as Exhibit C to the Motion.

14. In accordance with Rule 66.1(c) of the Court's Local Rules, the compensation of the Receiver, the Receiver Professionals, and all those who may have been appointed by the Court to aid in the administration of the Company, the conduct of its business, the discovery and acquisition of its assets, the formation of reorganization plans, and the like, shall be ascertained and awarded by the Court in its discretion, upon application made in accordance with the applicable Local Rules.

15. Plaintiff has agreed to, and shall, fund the payment of the professional fees and Plaintiff shall be entitled to reimbursement for such Receivership Expenses in priority to other claims, except as otherwise provided by law.

16. By Monday, December 23, 2024, the Receiver must provide to the Court, through counsel for the Plaintiff, an estimate of its total fees for serving as the Receiver for the next 14 days. The Plaintiff shall deposit double the amount of the Receiver's fee estimate in the event it is determined at the hearing on January 3, 2025, or any continuance thereof, that the appointment of a Receiver was not supported by the law and the facts presented. The timing of the plaintiff's deposit will not in anyway impact the effective date of this Order, which is December 21, 2024.

17. No bond shall be required to be posted by the Receiver.

18. By Monday, December 23, 2024, the Receiver shall file with the Clerk of this Court an Undertaking and Oath of Receiver, conditioned that the Receiver will faithfully discharge its duties as such and will faithfully obey the Order of the Court.

19. The Receiver may seek direction from this Court on any matter related to this Order, including, but not limited to, relief from or modification of the provisions of this Order.

20. For the term of this Temporary Order, Plaintiff shall, and without need for Court approval, make advances for payment of the following expenses in aid of the Receiver:

   a. Security for the Assets;

   b. Utilities for the Company, including gas, electric, telephone, and water;

   c. Insurance for the Assets;

   d. Taxes of any kind or nature accruing during the receivership required to be paid on the Assets;

   e. Expenses for the operation and maintenance of the Company, including but not limited to undertaking any construction, repairs, maintenance, or alterations of the Assets;

   f. Subject to any applicable Court approval procedures, expenses for attorneys, accountants, or other agents employed by the Receiver; and

   g. Any other expenses of the receivership estate, subject to any approval procedures imposed in this Order or by this Court.

21. Any and all monies advanced by Plaintiff shall become expenses of the administration of the receivership accruing interest until refunded at the federal judgment interest rate.

22. The Receiver is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

23. This Temporary Order and the Receiver's appointment shall remain in full force and effect through January 3, 2025.

24. The Plaintiff shall immediately serve all Defendants with a copy of this Order and certify service of the Order on the docket.

25. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Temporary Order.

**IT IS SO ORDERED this 21st day of December 2024 at 12:00 p.m.**

Dated: December 21, 2024

_____
**HONORABLE SARA LIOI
CHIEF JUDGE
UNITED STATES DISTRICT COURT**